1                    UNITED STATES BANKRUPTCY COURT
                       EASTERN DISTRICT OF NEW YORK
2

3

In re:                          .    Brooklyn, New York
4                               .    January 23, 2013
VOTVOT, INC.                    .    12-47878
NEW YORK SPOT, INC.,            .    12-48530
6           Debtors.           .    Calendar Time:
. . . . . . . . . . . . . . .        2:30 P.M.
7
                       12-47878  VOTVOT, INC.
8

    [8] MOTION FOR RELIEF FROM STAY WITH RESPECT TO REAL
9        PROPERTY LOCATED AT 2413-2415 MERMAID AVENUE,
          BROOKLYN, NY 11224, BLOCK 7014, LOT 47, 48
10

                  12-48530  NEW YORK SPOT, INC.
11

    [7] ORDER SCHEDULING STATUS CONFERENCE FOR THE
12      PURPOSE OF DETERMINING AN APPROPRIATE SCHEDULE
         FOR THE PROPER ADMINISTRATION OF THIS CASE.
13     SIGNED ON 12/28/2012.  STATUS HEARING TO BE HELD
       ON 1/23/2013 AT 2:30 PM AT COURTROOM 3529 (JUDGE
14                 CRAIG), BROOKLYN, NY. (tml)

15     [8] MOTION FOR RELIEF FROM STAY AND TO RELIEVE
      RECEIVER FROM TURNOVER FEE AMOUNT.  FILED BY MARK
16            FRANKEL ON BEHALF OF WEST 22ND, LLC

17

                  BEFORE HONORABLE CARLA E. CRAIG
18

Attorney for Debtors:          GOLDBERG WEPRIN FINKEL GOLDSTEIN
19                             LLP
20                             1501 Broadway
                               New York, New York  10036
21                             BY:  J. TED DONOVAN, ESQ.

Attorney for West 22nd, LLC:   BACKENROTH FRANKEL & KRINSKY, LLP
22                             489 Fifth Avenue
23                             New York, New York  10017
                               BY:  MARK A. FRANKEL, ESQ.

24

25

```
 1                                                          2

 2

Attorney for 442 West 22nd
Street, LLC:                  FREDERICK E. PARK, ESQ.
 4                            72 Madison Avenue
                              Sixth Floor
 5                            New York, New York  10016

Attorney for U.S. Trustee:    U.S. DEPARTMENT OF JUSTICE
                              OFFICE OF UNITED STATES TRUSTEE
 7                            271 Cadman Plaza East
                              Brooklyn, New York  11201
 8                            BY:  GREG ZIPES, ESQ.

Attorney for Mermaid Lend,
LLC:                          RAVERT, PLLC
10                            116 West 23rd Street
                              Fifth Floor
11                            New York, New York  10011
                              BY:  GARY O. RAVERT, ESQ.

12

Court Recorder Operator:

14
Court Transcriber:            CATHERINE ALDRICH
15                            COMPU-SCRIBE, INC.
                              2376 Cleveland Street
16                            Bellmore, New York  11710

17

18

19

20

21

22

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
24

25
```

1          THE CLERK:  Number 76 and 77, 78, Votvot, Inc. and

2  New York Spot.

3          Appearances, please.

4          MR. DONOVAN:  Ted Donovan, Goldberg Weprin Finkel

5  Goldstein, for New York Spot.

6          MR. FRANKEL:  Mark Frankel, Backenroth, Frankel &

7  Krinsky, attorneys for West 22nd, LLC.

8          MR. PARK:  Frederick Park, attorneys for 442 West

9  22nd Street, LLC.

10          MR. ZIPES:  And Greg Zipes with the U.S. Trustee's

11  Office.

12          THE COURT:  Okay.  Who's -- you're here for Votvot

13  as well, right?

14          MR. DONOVAN:  Yes.

15          THE COURT:  Okay.  Which one should we take first?

16          MR. DONOVAN:  Your Honor, I think take Votvot first

17  because it's only going to take a moment.

18          THE CLERK:  I'm sorry.  We have one more counsel.

19          Could you just give your appearance?

20          MR. RAVERT:  Good afternoon, your Honor.  Gary

21  Ravert of Ravert, PLLC for Mermaid Lend, LLC.  I'm sorry.  I

22  didn't hear the Court call Votvot.

23          THE COURT:  And you're on Votvot?

24          MR. RAVERT:  Votvot, your Honor, yes.

1          THE COURT:  Okay.

2          MR. DONOVAN:  Your Honor, we have worked out an

3  agreement whereby the debtor is going to make payment to the

4  secured creditor.  The secured creditor is going to basically

5  sell the mortgage at a discount, and we've got a stipulation

6  that's been signed.  We need to have it signed by my office,

7  and I don't believe there's any other creditors here, so we

8  should be able to just submit the stipulation.

9          THE COURT:  So you're selling the mortgage on Votvot

10 that's being sold at a discount to who?

11         MR. DONOVAN:  Mr. Nelkenbaum has a party who's

12 coming in to help him finance -- refinance this, and so we're

13 paying it off under terms that are $50,000 upon approval of

14 the stipulation, 30,000 by February 28th, and the balance of

15 $620,000 by April 30th.

16         THE COURT:  Okay.  And this will -- and then who

17 will -- who is that person who's coming in to do this?

18         MR. DONOVAN:  My understanding is it's -- I can't

19 think of his name.  The gentleman from Martense who also wants

20 to fund the plan in New York Spot.  I'm just blanking out on

21 his name this second.

22         THE COURT:  Aron Tessler?

23         MR. DONOVAN:  Yes.  Tessler.  That's it.

24         THE COURT:  Okay.  So Mr. Tessler is going to

1   purchase the mortgage from Mermaid, LLC at a discount?

2           MR. DONOVAN:  That's correct.

3           THE COURT:  And the amount that's owed at this

4   point, the judgment amount is about a million five?

5           MR. DONOVAN:  A million eight, your Honor.

6           THE COURT:  A million eight.  Okay.

7           MR. DONOVAN:  Almost a million nine, and we're

8   paying 700,000 for it.  I don't believe there's any other

9   creditors here.  I just wanted to procedurally make sure

10  that's correct, and if that's also -- I just got today from

11  the receiver all of his information because he's going to be

12  owed money, but he's also holding about $60,000 in his estate

13  account, and so -- and he sent me a proposed stipulation that

14  would terminate his receivership and turn that money over to

15  the debtor.

16          So procedurally what we're going to do is either

17  submit the stipulation to the Court to be approved --

18          THE COURT:  Well, wait a minute.  Mr. Tessler buying

19  a mortgage from Mermaid, LLC at a discount doesn't require my

20  approval.  That's not -- it's not a plan.  It is a claims

21  transfer.  I suppose you have to do -- I don't think that

22  requires Court approval, does it?

23          MR. DONOVAN:  Well, your Honor, what we would --

24  once we have the stipulation signed what we need to then do is

1 have the case dismissed, and it's really a question of whether

2 we have -- whether we have to do that on notice or whether

3 this is the only creditor and we can agree to it, and I just

4 want to verify that.

5          THE COURT:  Your schedules have other creditors.

6          MR. DONOVAN:  Well, that was what I said, but I --

7 they put in their papers that there weren't any.  I thought

8 there were other creditors, so we're going to have to make --

9          THE COURT:  Well, there may not be.  They may be

10 insider creditors, but you have other creditors.

11          MR. DONOVAN:  Right.  So we'll have to make a motion

12 to formally dismiss the case.

13          THE COURT:  I think so, and the question is with how

14 much prejudice will it be dismissed at this point?

15          MR. DONOVAN:  Yes, and we'll talk to counsel about

16 that, and we'll see what we can agree to.  We've agreed

17 before, so I don't expect that will be an issue.

18          THE COURT:  Okay.  So you want a brief adjournment?

19          MR. DONOVAN:  Yes, and my expectation is that within

20 the next day or two we'll have all the procedural issues

21 sorted out.  We just got the stipulation finalized this

22 morning.

23          THE COURT:  So you don't even really need to do --

24 to discharge the receiver or have an accounting or anything

1  like that because you'll take care of all of that after you

2  dismiss the case?

3          MR. DONOVAN:  Probably.  In fact, if we've got to do

4  a formal dismissal on 21 days notice we'll have it done before

5  -- we'll have all those I's dotted and T's crossed before we

6  come in for the dismissal.

7          THE COURT:  Okay.

8          THE CLERK:  February 20th at 2:30.

9          MR. DONOVAN:  I didn't hear what she said.

10          THE COURT:  February 20th at 2:30.

11          Do you have anything on this, Mr. Zipes?

12          MR. ZIPES:  Your Honor, I would just say this.  If

13  the case is going to be dismissed and there are no other

14  creditors, then that's obviously fine, but there should be

15  some --

16          THE COURT:  Well, there are other creditors listed.

17   Let's see.  Which is -- this one is Votvot, right?  Let's

18  look at the schedules.  Who is purchasing the claim, Mr.

19  Tessler, or is the debtor doing that?

20          MR. DONOVAN:  Well, the way that the stipulation is

21  written, the debtor is doing it.

22          THE COURT:  Well, then that does require Court

23  approval.

24          MR. DONOVAN:  Right.

1          THE COURT:  He's lending money to the debtor who's

2  going to then --

3          MR. DONOVAN:  Exactly.

4          THE COURT:  -- pay off the mortgage?

5          MR. DONOVAN:  Yes.

6          THE COURT:  That does require Court approval.

7          MR. DONOVAN:  Again, your Honor, I didn't negotiate

8  this.  I'm not a hundred percent familiar with the details,

9  but I said procedurally I think we just need to sort out how

10 to present it to the Court.  We have the deal in place.

11         THE COURT:  Okay.  Let me just get to the -- yes.

12 You have Aron Tessler, Bailis Nieman (ph.), Charles Neiss,

13 Landlord Services, LLC.  Is that -- that must be -- is that a

14 company that is controlled by Mr. Nelkenbaum?  Who is the

15 landlord?

16         MR. ZIPES:  It's the same creditors as in New York

17 Spot.

18         THE COURT:  Yes.  Who are these creditors?

19         MR. DONOVAN:  That's the manager, the property

20 manager, your Honor.

21         THE COURT:  Right.  Is that --

22         MR. DONOVAN:  It's not controlled by Mr. Nelkenbaum.

23         THE COURT:  Okay.  And so but Tessler, Nieman,

24 Neiss, and Sol -- I don't know who Sol Mermelstein is, but

1  those other three names are certainly names that were

2  creditors in the --

3            MR. DONOVAN:  Right.  These are people that have

4  loaned money to Mr. Nelkenbaum that was spread among a number

5  of his different properties.

6            THE COURT:  Are they insiders?

7            MR. DONOVAN:  No.

8            THE COURT:  Okay.  I mean I'm not -- I don't know --

9  I guess it doesn't matter at least in Votvot whether they're

10  insiders or not, but I'm skeptical, let's just say.  I'm

11  suspicious based upon what I saw in the -- what was the -- the

12  Martense case.

13            MR. DONOVAN:  I understand, your Honor.

14            THE COURT:  So I think it's a good thing that you're

15  resolving it this way.

16            MR. DONOVAN:  Yes.

17            THE COURT:  And okay, all right.  So I'll give you

18  another -- you have another date.

19            MR. DONOVAN:  Yes.  As I said, we'll sort out

20  procedurally how to proceed, how to move this along and have

21  it all returnable in February.

22            THE COURT:  Okay.

23            MR. RAVERT:  Your Honor, with respect to the lift

24  stay motion, I do expect us to resolve this, but if it's okay

1 with the Court, we'd like to continue the lift stay motion to

2 that date.

3        THE COURT:  Oh, sure.  Yes.  I wasn't going to mark

4 it off or mark it settled yet.

5        MR. DONOVAN:  That's fine, your Honor.

6        THE COURT:  Okay.

7        MR. ZIPES:  Your Honor, this might be stating the

8 obvious, but the motion should describe whether the -- who

9 these creditors are, whether they're real and what their

10 treatment is by the debtor as well.  That would -- because in

11 theory, your Honor, perhaps the case should not get dismissed

12 if there's unencumbered assets here that could be used for

13 real unsecured creditors.

14        THE COURT:  Unencumbered assets?  What -- this is --

15 these are -- this is -- it seems like these are properties

16 that are worth about half as much as the secured debt.

17        MR. ZIPES:  We just heard that the mortgage -- your

18 Honor, I'm just going by what I heard, but at the --

19        THE COURT:  You just heard that the mortgage is

20 being sold at a huge discount.

21        MR. ZIPES:  At a huge discount, and if there's any

22 equity in this property after the mortgage is reduced, then

23 the motion should explain this.

24        MR. DONOVAN:  That's fine.  We'll lay it out.

1          THE COURT:  And certainly the other creditors will

2    have an opportunity to object.

3          MR. ZIPES:  Yes.

4          THE COURT:  Okay.  All right.  New York Spot now.

5          MR. FRANKEL:  Mark Frankel, Backenroth Frankel &

6    Krinsky, attorneys for West 22nd, LLC, the mortgagee, with the

7    lift stay motion.

8          Your Honor, I want to first start off by commenting

9    on the creditors of New York Spot because they're the same

10   creditors that were in the previous case, and they appear to

11   be the same creditors in all of the dozen or so cases that Mr.

12   Nelkenbaum has filed over the last year or two, and the

13   amounts never change.

14         THE COURT:  I think I've only seen, let's see, three

15   or four at the --

16         MR. DONOVAN:  Your Honor, I believe there's six.

17         MR. FRANKEL:  Counselor --

18         THE COURT:  Six here?

19         MR. FRANKEL:  Tessler, Nieman, Neiss, Landlord

20   Services, LLC, and NC Caller.  These are the same creditors in

21   every petition.  Tessler and Neiss are always in unknown

22   amounts.  At the 341 meeting the last time we had the case,

23   the first filing, the debtor didn't know if he had documents,

24   didn't who they were.  Maybe he knew them, maybe he didn't,

1  couldn't figure out how much it was.  Maybe it was 10 million,

2  maybe it was a million, and it just sort of stretches

3  credulity that if they're owed that much money that they --

4  they don't ever appear and they never complain.  They never

5  have a problem with dismissal, with a plan.  Whatever it is

6  the debtor wants to do it's okay.

7           THE COURT:  You think they're fictitious creditors

8  perhaps?

9           MR. FRANKEL:  I don't know.  I just think that

10 they're --

11          THE COURT:  Created for the purpose of making this

12 look as though it's not a two-party dispute?

13          MR. FRANKEL:  Yes.  They may be owed money, but

14 they're definitely placeable.  There's -- in every case, and

15 so against that background on a repeat filing I think that the

16 burden on the debtor to come forward with some constructive

17 way to get out of bankruptcy is especially heightened, and in

18 this case the mortgagee has shown, based upon the debtor's own

19 valuation in its petition, that the debtor lacks equity in the

20 property.

21          THE COURT:  Okay.  Now let's get -- give me the

22 numbers, please.

23          MR. FRANKEL:  3 million is the scheduled value of

24 the property.

1      THE COURT:  And what's the amount that your client's

2  owed?

3      MR. FRANKEL:  I believe it was 3 million.  Actually,

4  it is not scheduled here, but it was in the Local Rule

5  affidavit.  My client's owed slightly in excess of 3 million,

6  and then there's $100,000 of New York City real estate tax

7  liens, and apparently this time around NC Caller may have a

8  mortgage as well for 600,000.

9      THE COURT:  Really?  Where is that?  Does that show

10  up on the schedules?

11      MR. FRANKEL:  I believe it was in the objection to

12  the lift stay motion.  There's not a whole lot of consistency

13  across the documents, but I believe I saw that.  Yes.

14  Paragraph 13, the property is also subject to a second

15  priority mortgage lien in the principal amount of $635,000

16  held by NCC Capital, LLC.

17      MR. DONOVAN:  Which is listed in the schedules, your

18  Honor, under Schedule D as a secured creditor.

19      MR. FRANKEL:  I apologize for saying that it wasn't.

20   I must not have turned the page.

21      THE COURT:  Here it is.

22      MR. FRANKEL:  Yes.  That's correct.

23      THE COURT:  Okay.

24      MR. FRANKEL:  The debtor lists us as a mortgage

1  holder in a lesser amount, but actually we have a judgment

2  that was not appealed, that's a final order, and it's in the

3  amount of about 3 million.  So I don't think that there's any

4  wiggle room on our claim because there's been no appeal and

5  it's no longer subject to challenge.

6          So we are not in a position to give the debtor a

7  reduction.  We -- my clients actually feels like they've been

8  jerked around with a serial filing and no attempt to try to

9  resolve it until the second bankruptcy comes around, having

10 gone through a bankruptcy, gotten false promises the first

11 time around, and then had the foreclosure delayed by make-way

12 types of challenges that were quickly disposed of in state

13 court, and now we're back and all of a sudden Mr. Tessler, who

14 comes out of the blue and says, "I want to invest in the

15 property," the same Mr. Tessler who's been in this case since

16 day one and every other case in an unknown amount.  He's got

17 money, but it's all subject to us reducing our claim.  We're

18 not reducing our claim, and there's nothing to show that the

19 debtor has got any real prospects for a plan.  There's nothing

20 beyond vague generalities.  There's no outline of what the

21 plan will look like.

22         If it's going to be based upon wiping out our

23 default interest, it can't happen.  We have a judgment.  If

24 it's going to be based upon a sale, that's just not credible

1  because they said that the last time they were in bankruptcy,

2  and then they didn't do it, and if it's -- so if it's going to

3  be based upon a consensual deal, they've burned those bridges.

4   They have to come forward now and show that there is

5  something real here, and just saying that it's early in the

6  case, we haven't decided yet, it's early in this case, but

7  it's two years since the first case was filed.

8           If they haven't figured it out yet they're not going

9  to, and they say that it's our fault that the property can't

10 meet its expenses because we're not putting in tenants.  That

11 is completely hypocritical because they cite in the objection

12 to the motion that were the property empty and ready to be

13 redeveloped for something other than an SRO hotel, it would be

14 worth 3.6 million.  That's probably true, but to get it empty,

15 to get it to that position requires heavy subsidies to carry

16 the property without income.  This is --

17          THE COURT:  Until the tenants are --

18          MR. FRANKEL:  Until they're --

19          THE COURT:  -- evicted or their leases are up or --

20 are these typically short term?  How are these -- what are the

21 lease arrangements for these?

22          MR. FRANKEL:  These are rent-stabilized SRO hotel

23 units, and it isn't like you can put someone in like a

24 corporate apartment for a month.  These are the kinds of

1  apartments that are only occupied by people who've got no

2  place else to go, and those are the hardest people to evict

3  when they stop paying rent or for whatever reason you want to

4  get them out.  It takes a long time and it costs a lot and it

5  eats into the value, ultimate value of the property because no

6  one's going to buy it knowing that they have this challenge to

7  get to the point where it can be redeveloped.

8           So to say that we're going to -- we think that the

9  receiver should be thrown out so we can put tenants in, is to

10 my mind equivalent to a terrorist tactic in the world of real

11 estate because what you're doing is you're threatening to blow

12 up the value of the place because you're not getting what you

13 want, and that's just not fair, and it shouldn't happen here.

14  The debtor -- by the way, even if they were to fill the place

15 up, when they were operating it, it was not paying the bills.

16  When we came in -- not we, our predecessor, Intervest Bank,

17 came in they had to pay 10, $15,000 to put insurance on the

18 property, to fix life safety type violations in order to keep

19 the place from serious problems with the city.  It's an

20 expensive place to carry, and the debtor's just not willing to

21 do it.

22          So our value, the value of the collateral is

23 therefore, declining.  Real estate taxes aren't being paid,

24 and it's got to be subsidized and the debtor's not willing to

1  do it.  For those reasons we don't think there's a viable

2  plan, nor do we think that there's adequate protection, and

3  that even though it's early in the case, this is a kind of

4  case where the -- it's appropriate to lift the stay right off

5  the bat because it's a repeat filing.  We've already seen this

6  movie, and it doesn't work out to a happy ending.  Therefore,

7  we would request that the Court lift the stay.

8         THE COURT:  And just so we're clear on the grounds,

9  you're saying there is a -- there's a lack of equity based

10 upon the debtor's own numbers and there's no -- they have not

11 come forward with any reasonable prospect for a

12 reorganization?

13        MR. FRANKEL:  Yes.  That would be Section 362(d)(2),

14 and under 362(d)(1) the debtor -- the property is declining in

15 value or the equity is declining in value because real estate

16 taxes are accruing and going unpaid, as well as other -- our

17 mortgage isn't -- our judgment isn't being serviced, nor is

18 any other debt except for what the receiver has been able to

19 expend, and he's only done it with advances from the secured

20 creditor.

21        THE COURT:  Okay.

22        MR. DONOVAN:  Your Honor, we have to put this into a

23 little bit more context than Mr. Frankel has provided so far.

24  Mr. Nelkenbaum through his different companies has owned

1  several different properties.  He financed the purchase of

2  those properties and renovation to those properties through a

3  series of loans from several different individuals, Mr.

4  Tessler, the NC entity, and Mr. Neiss, and so they are

5  creditors of all of his companies because not only did they

6  provide money to all of his companies, but they also when they

7  provided funding to one company they had cross-guarantees by

8  the other companies so that they could protect their

9  investments.

10          It's for that reason that they're willing to work

11  with us as we come to each one of these cases and try to sort

12  things out.  Can we make money on this one?  No.  Okay.  We'll

13  let it go.  Can we make money with this one?  Yes.  So for

14  example, we had filed for 35 Brick, and they were -- we

15  dismissed that case because they stepped in and we were able

16  to take care of that mortgage.  They financed the confirmation

17  in Martense.  They just -- Mr. Tessler just stepped up and is

18  financing the resolution of the Votvot case.

19          Mr. Tessler has now indicated that he's interested

20  in coming in and working on this one, and your Honor, we're

21  caught in a little bit of a vise.  At the one hand they're

22  saying, "Well, there's no adequate protection because you

23  don't make any money on the property," but you can't make any

24  money when you're trying to do that which will expand the

1 equity down the road, which is empty out all the tenants.

2          THE COURT:  Right.  Somebody has to -- you have to

3 be in a position to invest money in this.

4          MR. DONOVAN:  That's correct, your Honor, and what

5 we're saying is now that Mr. Tessler has said he's going to

6 step up and finance this, take the receiver out, put Mr.

7 Nelkenbaum back into the property.

8          THE COURT:  I don't think we're taking --

9          MR. DONOVAN:  Mr. Nelkenbaum will pay off --

10          THE COURT:  I don't think we're taking the receiver

11 -- how long has this receiver been in here, years at this

12 point?

13          MR. DONOVAN:  Probably three.

14          THE COURT:  Okay.  I don't think we're taking the

15 receiver out in this situation.  I would think that if you're

16 telling me you're going to get this -- this is going to be a -

17 - you understand I assume, and I think that you said something

18 to the effect that your time in Chapter 11 this time around is

19 not going to be long.

20          MR. DONOVAN:  Absolutely.  Your Honor, we weren't

21 here long last time.

22          THE COURT:  Okay.  Right.

23          MR. DONOVAN:  We came in.  We agreed to a very short

24 period that we would do something or not.  That period ended

1 and then we consented to a six-month --

2          THE COURT:  So Mr. Tessler's going to come in, he's

3 going to do a deal somehow.

4          MR. DONOVAN:  Yes.  He's going to take out the

5 secured lender, and that will -- and then you can do what you

6 want I guess because everybody else will be fine with that.

7 That's the concept, right?

8          MR. DONOVAN:  Yes.

9          THE COURT:  I don't think you're taking -- we're

10 taking the receiver out while that's going on.  That doesn't

11 make any sense to me.  You're going to have a short window of

12 time to see whether you can come up with some funding, and in

13 the meantime we're going to take the receiver out?

14          MR. DONOVAN:  Your Honor, at the least --

15          THE COURT:  How would that be in the best interest

16 of creditors?

17          MR. DONOVAN:  Your Honor, I'm not going to argue the

18 point.  I understand what you're saying.  We would like to

19 have access to the property so that we can put some tenants in

20 immediately and start generating some money on a short-term

21 basis, but what I'm --

22          THE COURT:  All right.  Well --

23          MR. DONOVAN:  -- more concerned about, your Honor,

24 is at the least what we would like is for the receiver to

1 provide us with a current statement of what the -- how many

2 tenants there are and what the status is.

3        THE COURT:  The reason that it's not a good idea to

4 start putting people into the property is because --

5        MR. DONOVAN:  Your Honor, you can put people in

6 without --

7        THE COURT:  -- if this falls apart, then they're

8 back in possession and you've just eroded the value of the

9 property for them.

10        MR. DONOVAN:  No, your Honor.  You can put people in

11 without putting them in a situation where they're stuck --

12 where we're stuck with those people.  You don't have to put in

13 the SRO tenants that are subject to the stabilization, but be

14 that as it may, I understand your Honor's point, but we do

15 think that what they're doing here is playing a little bit of

16 a shell game with the equity saying there's no equity in this

17 because today there's no equity.  If we can in fact do this

18 conversion there's substantial equity in the property --

19        THE COURT:  Well, there is, but you need --

20        MR. DONOVAN:  -- and we'd like the opportunity to do

21 that.

22        THE COURT:  If you know, right, but you'd have to

23 have somebody who's prepared to carry the property while

24 you're getting the other tenants out.

1          MR. DONOVAN:  Yes, and Mr. Tessler has now stated

2 he's going to step up and do that, so what we'd like --

3          THE COURT:  Well, they also have to be able to take

4 Mr. Frankel's client out and then fund it.

5          MR. DONOVAN:  Yes.  We have to put together a plan

6 that deals with his claim, absolutely.

7          THE COURT:  Okay.  Right.  You're going to have to,

8 if you want to avoid the lifting of the stay, you're going to

9 have be in a position where you are going to be paying some

10 adequate protection payments to Mr. Frankel's client, and

11 you're going to be keeping -- you're going to be paying taxes

12 on the property so his lien's not being eroded while you're

13 figuring out what you're going to do.

14          MR. DONOVAN:  I understand that, your Honor.

15          THE COURT:  So Mr. Tessler's coming in.  What is --

16 he's going to do what?

17          MR. DONOVAN:  He's going to provide the financing

18 for a plan.

19          THE COURT:  In what -- and what is the concept of

20 what that plan would be, and how much financing is he

21 providing?

22          MR. DONOVAN:  Your Honor, there are a couple of

23 different ways to do a plan right now.  We could do a plan

24 that pays off the mortgage in full and provides a

1 distribution, pays off whatever priority claims there are,

2 pays off the taxes, and then provides some distribution to the

3 other creditors.  We can -- given that at the moment according

4 to their papers the property is actually only worth about $2

5 million, we could even do a cram-down plan here.

6          THE COURT:  I don't -- how does that work?  How are

7 you going to cram them down?  Do you have an impaired

8 consenting class?

9          MR. DONOVAN:  Sure, because we have the second

10 mortgage --

11          THE COURT:  Well --

12          MR. DONOVAN:  -- which is an impaired assenting

13 class because they're willing to go along with this because

14 they have liens on other properties that Mr. Nelkenbaum is

15 involved in.

16          THE COURT:  Okay.  So they have -- what's the value

17 of the property according to --

18          MR. DONOVAN:  According to the affidavit -- the

19 appraisal that's attached to Mr. Frankel's papers, the value

20 of the property as of June of 2011 was $2 million, and he's

21 telling us it's a wasting asset.

22          THE COURT:  Okay.  2 million.  Mr. Frankel's client

23 has a claim in excess of 3 million.  That gives them a million

24 dollar deficiency claim that you -- the way this -- if I'm

1 | remembering correctly you have to get it, for a class to
2 | accept a plan there has to be a -- they have to have two-
3 | thirds an amount and a majority in number of claims accepting,
4 | so that means that if Mr. Frankel's client has one-third of
5 | the unsecured debt by virtue of --
6 |               MR. DONOVAN:  Because I have --
7 |               THE COURT:  -- his deficiency claim --
8 |               MR. DONOVAN:  -- a second secured creditor who has a
9 | -- an impaired class.
10 |               THE COURT:  His second secured creditor is going to
11 | be also an unsecured --
12 |               MR. DONOVAN:  The second secured creditor is a
13 | secured creditor.
14 |               THE COURT:  He's got a -- he like Mr. Frankel has a
15 | -- his claim is entirely a deficiency claim, is it not?
16 |               MR. DONOVAN:  And under the research that I've done
17 | so far, your Honor, I can classify him separately.  Because
18 | he's a secured creditor he is supposed to be classified
19 | separately.
20 |               THE COURT:  But he's got an unsecured claim just
21 | like Mr. Frankel's client.  Mr. Frankel's deficiency claim
22 | will be -- you can't take -- okay.  You have $2 million in
23 | value and $3 1/2 million -- 3.6 million in claims, correct?
24 | Mr. Frankel's client has the first 2 million.  They have a

1  secured claim for 2 million.  They have an unsecured claims

2  for a million.  Mr. NCC Caller, whoever he is, he's got an

3  unsecured claim for 600,000.  He doesn't get a secured claim

4  if his claim is fully unsecured.

5          MR. DONOVAN:  Your Honor, he has a secured claim.

6  It's a question --

7          THE COURT:  It's --

8          MR. DONOVAN:  -- of collateral under 506, and for --

9          THE COURT:  If it's fully --

10          MR. DONOVAN:  -- classification purposes --

11          THE COURT:  If it is -- no, no.  No more than -- no

12  more so than -- you mean he -- you think he has a secured

13  claim, but Mr. Frankel's claim is partially unsecured?  His

14  claim is fully unsecured.  It gets lumped together with all

15  the unsecured claims.  You can call it whatever you want, but

16  it's unsecured.  If it's fully unsecured, it's unsecured, and

17  that's true in any chapter of the Code, but it's certainly

18  true in Chapter 11 unless I guess he makes an 1111(b)

19  election.  I don't know how that would work exactly in this

20  case.  I don't think he could because his value -- he can't

21  make an 1111(b) election because he doesn't -- you can't make

22  an 1111(b) election if your interest is of negligible value.

23          So if he's fully unsecured, he's more than fully

24  unsecured, he's got a million dollars of unsecured claim ahead

1  of him.  He's got a million dollars of deficiency ahead of

2  him, so by my mathematics you'd have to have $3 million of

3  unsecured claims in order to -- for Mr. -- let's see, a

4  majority amount, two-thirds in amount, a majority number,

5  you'd have to have another $2 million of unsecured claims in

6  addition to Mr. Frankel's client's million dollar deficiency

7  claim based upon that $2 million valuation to be able to

8  confirm a plan over his client's objection.  I don't think you

9  have 2 million even on your schedules with Mr. -- with the --

10 what Mr. NCC Caller's, what is it, 600 something?

11         MR. DONOVAN:  635.

12         THE COURT:  No.  Not even close.  So you -- do you

13 follow what I'm saying here?  A fully -- a wholly unsecured

14 second lien does not get to be classified as a secured claim

15 for Chapter 11 plan purposes.  They certainly don't get an

16 unsecured -- a secured claim while the first lien that's ahead

17 of them has a huge deficiency claim.  That doesn't make any

18 sense.  They get classified as secured and get the benefits of

19 secured status while the second -- the first lienholder ahead

20 of them is partially unsecured?  That's not correct.

21         So you -- I don't see just mathematically how you're

22 doing this.  Okay.  Let me see if I can get to your claims

23 here.  Okay.  You have 4442 West 22nd Street.  That's you?

24 That your client?

1           MR. PARK:  Yes, your Honor.

2           THE COURT:  Okay.  You've got --

3           MR. DONOVAN:  They're owed about 150,000 now, your

4    Honor.

5           THE COURT:  Well, 50,000 plus 220.  You have -- just

6    looking at your schedules, you have 72,500 in unsecured

7    priority claims plus -- or 85,000 all together, plus your

8    second lienholder as against Mr. Frankel's client's deficiency

9    claim of a million.  So you don't have anything like what you

10   would need.  That gives you -- 635 plus 85, okay, that's

11   720,000 versus Mr. Frankel's million dollar deficiency claim,

12   and then -- and that you would need 2 million overall in

13   unsecured claims in order to counterweight his client's

14   control of the unsecured creditor class.  So I don't see how

15   you're doing this without his client -- his cooperation.

16          MR. DONOVAN:  Unless he gets paid in full, and if

17   that's the way the numbers have to go, that's the way the

18   numbers have to go, but I'm not conceding that I agree with

19   your Honor on the classification issue --

20          THE COURT:  What's the theory?

21          MR. DONOVAN:  -- but I'm not going to argue with

22   you.

23          THE COURT:  You --

24          MR. DONOVAN:  Your Honor --

1          THE COURT:  You're a better bankruptcy lawyer than

2     that.  That can't -- you can't -- you cannot possibly think

3     that that is correct.

4          MR. DONOVAN:  Regardless, the debtor has shown

5     through its other cases, Martense and Votvot specifically,

6     that Mr. Tessler has funds and is available, and is willing to

7     stand up, and your Honor, what we're asking for is the

8     opportunity which we haven't been able to do in the few weeks

9     since we've gotten involved in this case for the second time,

10    that we haven't had the opportunity to do it, to put together

11    a plan.  I agree with you that in the meantime the debtor

12    needs to be paying the real estate taxes.  There were some

13    taxes that became due in January.  There's no more taxes that

14    will become due until April.  I do understand that adequate

15    protection has to be provided to the secured creditor, and

16    we're asking that you give us that opportunity.

17         THE COURT:  Well, I don't see again how you're doing

18    this without paying them off in full.

19         MR. DONOVAN:  Well, we may have to.

20         THE COURT:  So why I don't give you a very brief --

21    since you've got your funder, I'll give you a brief -- very

22    brief window of opportunity to come up with a proposal to pay

23    Mr. Frankel's client in full since that's what you're going to

24    have to do.

1          MR. DONOVAN:  Your Honor, could we come back here on

2    March 5th, by which time we will have filed a plan and

3    disclosure statement?

4          THE COURT:  You know, I'm not interested in horsing

5    around with a lot of --

6          MR. DONOVAN:  I'm not going to file --

7          THE COURT:  -- nonsense here.

8          MR. DONOVAN:  Your Honor, I have to appear in front

9    of you all the time.  I'm not going to file something that I'm

10   never going to be able to appear in front of you again.  It's

11   going to be a real plan or it's not.

12         THE COURT:  Okay, but I'll hear from Mr. Frankel,

13   but --

14         MR. DONOVAN:  And your Honor, the only reason I say

15   --

16         THE COURT:  -- you're going to have pay -- in the

17   meantime you're going to have -- we're going to set the

18   amounts that you're going to need to pay in order to get to

19   March 5th.  So any order continuing the stay will be

20   conditioned on payments that are going to keep Mr. Frankel's

21   client at par at least until you get to March 5th from the

22   time of the commencement of this case.

23         MR. DONOVAN:  Well, your Honor, I would suggest --

24         THE COURT:  Yes.  March 6th.

1          MR. DONOVAN:  March 6th?

2          THE COURT:  Yes.

3          MR. DONOVAN:  I would suggest that we use the

4  formula in 362(d)(3), which sets it at the interest, the non-

5  default interest times the principal, times the -- I guess the

6  principal amount of the debt, whatever it is.

7          THE COURT:  Well, aren't they entitled to judgment

8  interest?

9          MR. FRANKEL:  We have a judgment.

10          MR. DONOVAN:  They have a judgment, so it would be

11  judgment interest.

12          MR. FRANKEL:  It accrues at nine percent.

13          MR. DONOVAN:  Nine percent?  Well, once there's a

14  bankruptcy are they entitled to judgment interest at the

15  federal rate or at the state rate?

16          THE COURT:  I don't know.  You tell --

17          MR. DONOVAN:  There's case law on both sides of that

18  issue I believe, your Honor.

19          THE COURT:  Do you think you could -- well, why

20  don't I order that you pay judgment at the -- pay interest at

21  the higher rate, and then we can, if we have to sort that out,

22  given that if this case is dismissed or if the stay is lifted,

23  it's the state rate that they'll be looking to collect.  So I

24  think that that -- maybe what you might be entitled to for

1 plan purposes would be different than you'd be entitled to for

2 these purposes.

3        MR. DONOVAN:  That's fine, your Honor, and --

4        THE COURT:  And they need to pay the taxes.

5        MR. DONOVAN:  Right.

6        THE COURT:  So is there a -- do you have a per diem

7 on your judgment by any chance, Mr. --

8        MR. DONOVAN:  Well, it's almost exactly $3 million

9 so it should be very easy to calculate.

10        THE COURT:  You could figure out -- I guess you

11 could just figure out what the per diem is on your -- on the

12 judgment, and you would -- how ever many days it is from the

13 petition date until March 6th, that's how much you have to

14 pay, and then that plus the taxes.

15        MR. DONOVAN:  Yes.

16        THE COURT:  But we have to figure out when that has

17 to be paid.  I guess nothing -- when was the case filed?

18        MR. DONOVAN:  December 18th.

19        THE COURT:  Okay.  And nothing's been paid so far I

20 guess?

21        MR. DONOVAN:  Correct.

22        THE COURT:  Okay.  So by February 1 can you make all

23 these payments?  Do you want to figure what the per diem is?

24 Do you want a calculator, Mr. Frankel?

1          MR. FRANKEL:  Okay.  I'll just go from an even 3

2  million, which is 270,000 a year, divided by 365.  I can't do

3  that in my head.

4          THE COURT:  Okay.  270 divided by 365?

5          MR. FRANKEL:  Yes.

6          THE COURT:  It's $740 a day if I've got that right.

7          MR. FRANKEL:  It sounds about right according to Mr.

8  Zipes' mental math.

9          THE COURT:  It's $739.72, .73 a day.

10          MR. ZIPES:  My mental math was 750, your Honor.

11          THE COURT:  Okay.

12          MR. ZIPES:  But yours was more accurate.

13          THE COURT:  So multiply that by the number of days.

14   So you can pay -- maybe you can just pay -- why don't you

15  just pay all at once the interest through March 6th plus the

16  taxes by February 1st?

17          MR. DONOVAN:  Your Honor, Mr. Tessler is in Israel.

18   Just can I have one more week just because I've got a lot of

19  back and forth when we try to get a hold of them.

20          MR. FRANKEL:  Your Honor, I've heard they have

21  telephones and e-mail in Israel now.

22          MR. DONOVAN:  Yeah, they do, but you know, there's

23  also time differences.  Everybody has their own schedules and

24  I just want to make sure --

1        THE COURT:  You want --

2        MR. DONOVAN:  -- I have the time to sort it out.

3        THE COURT:  Well, that's more than a week, isn't it?

4   Mr. -- when does Mr. Tessler get back from Israel?

5        MR. DONOVAN:  No, he's in Israel.

6        THE COURT:  When does he -- oh, he's in Israel, and

7   he's not coming -- I see.

8        MR. DONOVAN:  Yeah.

9        THE COURT:  Well, I think February 1st gives you

10  plenty of time.  That's ten days.

11        MR. DONOVAN:  All right.  Well, it's eight.  All

12  right.

13        THE COURT:  Yes.  So like I said, I think you should

14  do this by February 1st, and that will get you to -- and so

15  it's going to be the per diem through March 6th plus the taxes

16  payable February 1st.

17        MR. DONOVAN:  Just for the record, the per diem is

18  740 a day?

19        THE COURT:  Yes.  Okay.

20        MR. DONOVAN:  And the January taxes.  Okay.  Thank

21  you, your Honor.

22        THE COURT:  And Mr. Frankel, do you want to submit

23  an order to that effect?

24        MR. FRANKEL:  Yes, Judge.

1       THE COURT:  That the stay is continued conditioned
2  upon that.
3       MR. FRANKEL:  Yes, Judge.
4       THE COURT:  Okay.  Make sure that Mr. -- that
5  counsel gets a copy of that when you submit it to me.
6       MR. FRANKEL:  I will --
7       THE COURT:  Mr. Donovan.
8       MR. FRANKEL:  I will definitely try to do it on
9  consent, and I don't think there will be a problem.  Mr.
10  Donovan and I work well together.
11       MR. PARK:  Judge, may I be heard?
12       THE COURT:  Yes.
13       MR. PARK:  I represent one of the judgment
14  creditors, 442 West 22nd, LLC.  We have a state court judgment
15  that arose out of a contract dispute between my client and the
16  debtor.
17       THE COURT:  What was your client's relationship with
18  the debtor?
19       MR. PARK:  They bought the building from us.  They
20  then sued us, lost on summary judgment, and we were awarded
21  attorneys fees, which they're now listing as $50,000.  I don't
22  know how much we're going to be awarded because the attorneys
23  fees hearing has now been delayed since 2010, 2011.
24       THE COURT:  So this was sort of a punitive damages

1 award in state court or a --

2      MR. PARK:  It was an award of fees.  I wasn't

3 representing them at the time.  We were, however, supposed to

4 have a fee hearing on this this Friday.  That obviously is

5 stayed, however, and if the Court directs I can make my own

6 lift stay motion.  I don't see the harm in that number.  In

7 fact, I think that number ought to be liquidated so that the

8 Court has an accurate number of what that is and how it fits

9 in the plan.

10      THE COURT:  If this case falls -- certainly they're

11 going to have to liquidate that number if they're going to pay

12 you out, but if this is case is going to fall apart --

13      MR. PARK:  It's not going to be able --

14      THE COURT:  -- and be dismissed, it doesn't -- it's

15 not a useful thing to be doing right now.

16      MR. PARK:  Thank you, your Honor.

17      THE COURT:  If Mr. Tessler is going to come in and

18 propose some kind of -- the funding to pay a plan, then

19 obviously that claim would have to be fixed along with every

20 other claim.

21      MR. PARK:  Agreed, your Honor.  My feeling was only

22 that if it's an afternoon's hearing and you get an accurate

23 number, if the Court -- you know, I'll go with what the Court

24 directs.

1          MR. DONOVAN:  Your Honor, they can file a claim and

2 we'll see if we're even going to challenge it.

3          THE COURT:  Right.  You can -- that's I think a more

4 appropriate way to proceed.

5          MR. PARK:  Thank you, your Honor.

6          THE COURT:  Okay.  Anything else?

7          MR. FRANKEL:  No, your Honor.

8          THE COURT:  Okay.

9          MR. FRANKEL:  What time on the 6th was -- is the

10 adjournment?

11          THE COURT:  What time, Tracie?

12          THE CLERK:  3:00.

13          THE COURT:  3:00 o'clock.

14          MR. FRANKEL:  Thank you.

15

16                    *          *          *

17

18                        **CERTIFICATION**

19

20 I, Catherine Aldrich, certify that the foregoing is a correct

21 transcript from the electronic sound recordings of the

22 proceedings in the above-entitled matter.

23

                    *Catherine Aldrich*

1 _____        February 15, 2013

2          Catherine Aldrich